THE PEOPLE *ex rel.* Chicago Bar Association, Relator, *vs.* CORNELIUS R. ADAMS, Respondent.

*Opinion filed April 19, 1911.*

1. ATTORNEYS AT LAW—*right of an attorney to accept retainer from insane person.* Even though an attorney may know that a woman who calls upon him for legal advice is insane, he is not guilty of unprofessional conduct in accepting a retainer with the intention of honestly investigating the matters submitted to him and conscientiously advising her as to her legal rights.

2. SAME—*failure to use good judgment in dealing with insane client not ground for disbarment.* Failure of an attorney to use good judgment in dealing with an insane client is not ground for disbarment where there was no bad faith or attempt to take advantage of her mental condition, and where, upon being fully advised of the situation, the attorney severed the relation and at the first opportunity returned the money paid to him as fees.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

WILLIAM E. MASON, for respondent.

Mr. JUSTICE HAND delivered the opinion of the court:

This was an information filed in this court in the name of the People, upon the relation of the Chicago Bar Association, for the disbarment of the respondent, Cornelius R. Adams, a regularly licensed attorney and counselor of this court, who was engaged in the practice of law in Cook county. The information charged that on the second day of March, 1904, the respondent received a retainer of $10 from one Minnie M. Garis, and on May 2, 1904, received as a fee from said Minnie M. Garis the sum of $75, and again on June 19, 1905, the sum of $75; that at the time said retainer and fees were paid to the respondent by said Minnie M. Garis the said Minnie M. Garis was palpably insane, and that the litigation in which the respondent suffered himself to be retained by Minnie M. Garis, and for which he received the said retainer and fees, was without foundation and had no basis in law and was barred by the Statute of Limitations. The respondent answered the information, and the case was referred to David F. Matchett as a commissioner to take the proofs and report his conclusions. The commissioner took the proofs, and after overruling objections thereto, which have been renewed as exceptions in this court, found that the allegations of the information had been established and that the respondent had been guilty of unprofessional conduct in his dealings with Minnie M. Garis.

It appears from the record that respondent was admitted to the bar in this State in the year 1882, since which time he has practiced his profession in Cook county; that his standing at the bar was good and that no charge of

professional misconduct had been preferred against him to the Chicago Bar Association other than in connection with his employment by Miss Garis; that in 1904 Miss Garis called upon the respondent at his office in Chicago and desired to advise with him in regard to bringing a suit against the Inter-Ocean Publishing Company for libel and against her brother and sister for having caused her to be wrongfully incarcerated in an insane asylum in 1894; that at the time Minnie M. Garis called upon the respondent she was a stranger to him; that she appeared to be about fifty years of age, was in good health, was well dressed, was lady-like in her appearance and deportment, and her conversation showed her to be well educated and a woman of refinement and culture; that after she had stated her business to the respondent he informed her he could not give her his time without a retainer; that she thereupon, without hesitation, paid him $10 as a retainer, for which he gave her a receipt, which read as follows:

"CHICAGO, *March 2, '04.*

"Received of Miss M. Garis ten ($10) dollars, retainer fee for looking up and investigating the advisability of bringing suit for her unjust incarceration in asylum twice; also for damage for libel against the Inter-Ocean. I agree to file declaration if Miss Garis desires, on her advancing court costs.        C. R. ADAMS."

The commissioner in his report exonerates the respondent from all blame in accepting said retainer and for agreeing to investigate the advisability of bringing suits upon the causes of action which Miss Garis claimed for her wrongful incarceration in an insane asylum and for libel for the wrongful publication of the facts that she had been adjudged insane and incarcerated in an asylum, and as no objections or exceptions were filed to the commissioner's report by the relator, that portion of the charge contained in the information relating to the receipt of the retainer might properly be eliminated from the case. If, however, the relator had filed objections and exceptions to the portion of the commissioner's report which exonerated the respondent from

blame in accepting a retainer and undertaking to investigate the grievances of Miss Garis they would have been fruitless, as it is obvious there was, at the time the retainer was paid to the respondent, nothing in the conduct of Miss Garis, or in the causes of action which she claimed to have, which indicated that she was insane, or that she was not seeking legal advice as to her rights with a view to enforce them in the courts in the utmost good faith, and the fact that it was afterwards made to appear that she was insane when she called upon the respondent would not render his conduct culpable in accepting her retainer and in undertaking to investigate her legal rights, and if the respondent had known Miss Garis was insane when she first called upon him, and he in good faith accepted a retainer from her with the intention of honestly investigating the matters submitted to him and conscientiously advising her as to her legal rights in the premises, his conduct, from a professional standpoint, would have been entirely free from criticism. To hold otherwise would be in many instances to deprive an insane person of the aid and assistance of counsel when such aid and assistance were necessary to protect his rights.

The record further shows that Miss Garis, subsequent to March 2 and prior to the payment to the respondent of the fee of $75 on May 7, 1904, and the payment of the second fee of $75 to him on June 19, 1905, called upon the respondent at his office frequently, and that at the June term, 1904, he filed a declaration in trespass on the case in the superior court of Cook county in her name against the Inter-Ocean Publishing Company to recover damages for libel; that no service was obtained upon the Inter-Ocean Publishing Company, and the suit was subsequently dismissed on call for want of prosecution; that prior to the time respondent accepted each of said fees he had become fully advised as to the fact that Miss Garis had been incarcerated in an insane asylum, and as to the facts upon which she had sought to base actions for damages against

her brother and sister for wrongfully causing her to be incarcerated in the asylum and against the Inter-Ocean Publishing Company for publishing the facts concerning such adjudication and incarceration; and it is urged by the relator that the respondent, from the knowledge of such facts, knew, or was bound to know, that Miss Garis was, in fact, insane at the time he received the two sums, which aggregated $150, as attorney's fees from her, and that she never had a valid claim for damages against her brother and sister growing out of her incarceration in the asylum or a valid claim for damages against the Inter-Ocean Publishing Company for publishing the facts that she had been adjudged insane and incarcerated in an asylum, and that if she ever had a claim against either of said parties, based upon the transactions of which she complained, such causes of action accrued in 1894 or 1895 and were barred by the Statute of Limitations, and that in receiving such fees with a knowledge of all the foregoing facts the relator did not act in good faith toward Miss Garis, and that his conduct was unprofessional and merits disbarment.

The facts are, that in 1894 Miss Garis was adjudged insane by the county court of Shelby county and was incarcerated in the State asylum for the insane at Kankakee, where she remained for several months; that she thereafter left the asylum, apparently with the consent of the authorities in charge, and went to the home of a sister who resided in the city of Chicago, where she remained for some time and then voluntarily and alone returned to the asylum, where she remained for a short time, when, tiring of the situation, she returned to her sister's home in Chicago, where she has since resided; that prior to her being adjudged insane she had lived in Shelbyville, Shelby county, and had been engaged in teaching vocal and instrumental music, and that while in the asylum at Kankakee she had a few pupils in music in that city, and that since leaving the asylum the second time her time has been taken up

in teaching music and selling small articles from house to house in the city of Chicago; that since 1898 she has entirely controlled her own actions, has come and gone from her sister's house when and where she pleased, has made her own contracts, collected and handled her own money and been entirely free from all restraint, and while we are impressed, from the evidence, that from the year 1894 down to the date of the hearing before the commissioner Miss Garis was insane, still we think the evidence shows her insanity to have been of a peculiar type and of such a character that it was not readily noticeable by persons who were not familiar with her history. A number of witnesses called by the relator testified she was palpably insane, while a number of witnesses called by the respondent, who saw her frequently,—one a physician who had treated her and another a dentist who had performed work for her,—testified that they had never discovered anything in her conduct which indicated to them that she was insane; and her sister with whom she resided in Chicago stated that while she was insane her insanity was of a type which was not easily detected, and at times could not be discovered by reason of anything that she said or did; that she only manifested indications of insanity when her mind was dwelling upon certain subjects, upon which subjects, in her opinion, she was insane.

The evidence clearly shows that upon most subjects Miss Garis was entirely rational while on other subjects she was not. She appears to have had an exaggerated view upon the subject of her musical ability. She, at times, was suspicious of her sister, and stated to numerous persons that her sister was administering poison to her, and for many years she had been possessed of an inordinate ambition to engage in all sorts of litigation. The physicians who testified in the case designate her mental disturbance as paranoia. The evidence tends to show, and we are impressed with the view, that while the respondent did not suspect

that Miss Garis was mentally unbalanced when she first em-
ployed him, subsequently, and perhaps before he received
the last $75 which was paid him, he became suspicious that
she was not wholly responsible, mentally, for her actions.
He had at that time, however, accepted her money and the
relation of attorney and client existed between them, and
he did not, apparently, know how to get rid of his client or
to terminate their business relations, although he evidently
desired to do so very much, but seems to have been im-
pressed with the idea that if he did abruptly terminate such
relation she would in some way involve him in trouble,
as she was strenuously insisting that she would not receive
back her money from him although he offered to pay it to
her, and she was constantly urging him to vigorously prose-
cute the litigation which she had placed in his hands. It
is undoubted that for more than a year before the matter
was called to the attention of the grievance committee of
the Chicago Bar Association the respondent had offered to
return to Miss Garis all sums of money she had paid to
him, including the retainer, but that she refused to accept
the same, and that before the information was filed he had
refunded to her all sums received from her by him.

We think the evidence fails to establish that the re-
spondent was guilty of fraud in his professional relations
with Miss Garis. While a more delicate observance of the
proprieties of the profession might have required a sever-
ance of the relation of attorney and client between the re-
spondent and Miss Garis immediately upon his suspicions
being aroused that she was determined to pursue the liti-
gation whether she had any rational grounds or not, still
we cannot see that the respondent's action in failing to im-
mediately withdraw from the employment was fraudulent.
It appears that the respondent was not the only lawyer in
Chicago who was deceived by Miss Garis into believing she
had been mistreated and that the imaginary lawsuits which

she desired to bring possessed merit, as at different times she had a number of reputable lawyers in her employ who were engaged in investigating the same claims upon which the respondent afterwards was employed.

The main and controlling question in this case is, did the respondent throughout his professional employment by Miss Garis act toward her in good faith, or did he use such employment only as a means whereby he wrongfully obtained and appropriated to his own use the money of a client who did not possess sufficient mental capacity to employ him and who had no occasion to employ him? The respondent undoubtedly accepted the retainer of Miss Garis in the usual course of business and entered upon the investigation of her claims in the utmost good faith, and while he may not have shown the best judgment in failing to sever the relation of attorney and client immediately upon his being advised of the entire situation, we do not think that in continuing the relation he acted in bad faith toward his client or that he attempted to take advantage of her mental condition and the fact that he had her money in his hands to wrong her, but that he stood ready at all times, after he was advised of her mental condition, to return to her the money that she had paid him, and that he returned the same to her at the first opportunity. The respondent ought not to be disbarred for the failure to exercise good judgment in a matter in which a wiser and more experienced lawyer might honestly have made the same mistake.

From an examination of the entire record we are of the opinion the rule to show cause heretofore entered against the respondent should be discharged, which will accordingly be done.                    *Rule discharged.*